Our next case today is 2016-1155 Cumberland Pharmaceuticals v. Mylan. May it please the court. The district court failed to understand and apply the proper legal standards for obviousness and derivation. Its order should be reversed for two reasons. First, regarding obviousness. The district court erred in applying the wrong standard for reasonable expectation of success. Instead of considering what would be reasonably expected by a person of skill in the art, the district court applied a heightened and near-absolute predictability of success in excluding EDTA from the prior art formulation. The district court also erred by finding that there was no motivation in the prior art to exclude EDTA from the existing formulation. By doing so, the district court improperly ignored the explicit motivation in the prior art from the FDA approval letter. Specifically, this prior art letter instructed Cumberland to exclude EDTA from the existing prior art formulation because FDA expected that EDTA was not necessary and was known to cause certain adverse effects, including fatalities. This is admitted in sworn statements under penalty of perjury made by Cumberland, the patentee itself, in a citizen petition where it said from the outset that FDA wanted Cumberland to reformulate a prior art acetidote form product that it did not itself develop to exclude EDTA because of safety concerns. What is the evidence for the proposition that, let's assume that the FDA suggested you go figure this out, what is the evidence for the additional proposition that, as I think you just said, the FDA expected the project to succeed, namely to get to a sufficiently stable pharmaceutical product without EDTA, putting aside the requirement without any chelating agent? Okay, so I think it's several fold. First, from the very outset of the NDA approval process for the prior art acetidote that included EDTA starting in December of 2002, FDA said you need to justify the presence of EDTA. And this was in part due to what was called quality by design, which is where formulators by the time of 2002, but not back in the 70s when this prior art product was initially developed elsewhere in the world, they were looking at all ingredients, inactive ones like EDTA, and saying what's its purpose? Particularly EDTA, which the court admitted was known to have adverse side effects, including fatality. And so unless there's a justification for something to be there, you take it out. But I think what you just said seems to me to point rather against an affirmative expectation on the part of the FDA that one could do without chelating agents. Rather, they had a new general policy that says anything that's in here, you've got to make sure it belongs. We don't know whether it belongs before we study it or not. Well, that was the original reason for the justification. But then within six days, FDA said you have to include data in your submission. And then throughout the next almost two years, your 14 months, FDA is consistently saying you need to reformulate to take out EDTA. You need to study whether EDTA is doing anything in this formulation and you need to remove it. Right, but you just said in three sentences quite different things. One is you need to take it out. Where's the evidence for that? That's in the chemistry review and the approval letter and in the contemporaneous internal communications within Cumberland, as well as its sworn statement in the citizen petition where it said that FDA from the outset wanted acetidote to be reformulated to remove EDTA. That's a sworn statement that Cumberland, the patentee, made to FDA. Okay, can you give me the joint appendix site for that, please? Yes, it's the citizen petition is starting at A11688. 11688? A11688. The sworn statement under penalty of perjury is at A11697. And then the statement... Well, let's go a little slower. Why don't you tell me in, because 11688 is a wrong document. So tell me that's just a cover letter. The citizen petition follows that. Right, so tell me where in the citizen petition you think is the express admission that the FDA instructed them to take out heulating agents. That starts, I believe, well, it's at least at A11693. From the outset, FDA wanted Cumberland to investigate reducing or removing EDTA from acetidote. To investigate it. Right, because it was concerned with the safety. Because it was concerned about the safety. Yeah, but that's not... There are lots of additives in drugs that the FDA may question, is this really necessary, because it can have delirium deteriorate, bad side effects. And so why is asking them to investigate whether this is really necessary, the conception of a drug that doesn't include it in a complete concepted form? Because at the time of the NDA approval, FDA spent lots of time investigating and looking at all of the manufacturing and the product information, which included things like pH control and nitrogen in the head space. You're saying, no, that's not helpful. Show me evidence in this record that, because this sentence doesn't do it. This sentence tells, you said that there is evidence in this record that the FDA had a complete conception. So this sentence absolutely doesn't do it. Because all this sentence does is admit that the FDA wanted Cumberland to investigate removing EDTA. By no means does that demonstrate that somehow the FDA had the conception of the exact formulation of a drug that would not include any chelating agent. So where is that evidence? You rattled off a bunch of different evidence. This was the first piece. This doesn't do it. So take me to the second piece of evidence that you say does it. Well, if you look at the actual district court opinion on expectation of success, first the district court cites Unigine, and it cites it for an incorrect proposition. That's at 827 of the order. So if you go to 827 of the order, this is the only place where there's a discussion of the expectation of success. And it cites the four things. It cites to the background section of the patent that talks about other products, including EDTA. And then it cites to three portions. It credits three portions of Dr. Kitt's appellate expert's testimony. And it's clear by looking at that portion of his testimony that he testifies that there was a reasonable expectation, but the FDA wouldn't know for sure. And so, for example, if you go to ‑‑ But don't we require more than a reasonable expectation? I mean, it seems to me that our case law requires that the inventor, in this case the FDA, have a settled idea, a specific, settled idea. And I don't see that in any of these communications, and I don't understand how a 2012 letter several years after the fact helps you. Well, the settled idea goes to derivation and whether the FDA had a proper conception. The reasonable expectation of success goes to whether or not the chemistry review and the printed publication approval letter render obvious the claim to invention. The approval letter and the package insert are printed publications under 102B. And the prior art acetidote product, which included every single claim element of all of the asserted claims except that it included EDTA, is also 102B prior art. So then you look at whether the suggestion in the approval letter to study taking out EDTA and to remove it from the formulation of the drug product, which includes every other element, whether or not that would have been obvious to try in light of this expressed instruction and motivation expressed in the approval letter. And then you look at whether or not that would have had a reasonable expectation of success. And if you look at what the district court says on that, the district court applies a heightened standard. And then the district court specifically cites in credits testimony of Dr. Kent, where he says you would have had a reasonable expectation of success, but FDA wouldn't know for sure. So FDA is not going to approve a drug product. So, for example, that is at 8816 and 8817, which is cited from the trial transcript in 827 as 673.22 through 674.4, where Dr. Kent testifies specifically. There's documents that support essentially the removal. There's no direct documents. But certainly a person of ordinary skill would realize that by removing EDTA, there is certainly an expectation that it would be stable. Then the district court also cites the testimony in response to the court's questions, where the court says, and this is at 8823 and 8824. And so the court says at line 18, they thought most likely it was superfluous. Referring to FDA, thought that EDTA was superfluous. The witness says correct. The court, do you think the FDA opinion writers are persons of ordinary skill in the art? Witness says absolutely. Court, so they didn't know for sure that EDTA was superfluous. They thought it was superfluous. Witness, they see a lot. And the court says so they were pretty sure. Court continues, EDTA seemed superfluous to them, but they didn't know for sure. Otherwise, what's the point of asking for a study, right? The witness, well, it's the FDA world. A person of ordinary skill sees enough information to certainly that it would be expected. But the FDA wants confirmation, because they are obviously not going to approve a change in a drug formulation without doing a full study. And so if you- Just to be clear, this is your witness, right? This is our witness, but this is the only- I'm sorry. Oh, sorry. So the district court, as I read this, is saying, I don't have to believe Dr. Kent's testimony, period. And one reason I don't have to believe it is that even he conceded there are no prior art references. All the stuff that you're just reciting from the testimony is stuff that the district court did not need to credit, because there is not an objectively cited basis for it. Why do you think the district court had to accept these assertions? I think the district court did credit it and assert it, because that's all that's cited with respect to the expectation of success. If you look at the cited- The first sentence, no prior references, with one possible exception, taught or suggested a formulation would be safe without a chelating agent of some kind. And citing Dr. Kent saying, right, I can't actually cite to anything in the prior art, but I believe this. So why can't the district court say the absence of anything in the prior art is, to me, more persuasive than your assertion? Because this is an obviousness analysis, and so we're not claiming anticipation. We're claiming obviousness, and so it's obvious to try, because the district court doesn't make a finding that there's no reasonable expectation of success. The district court just says that you can't predict absolutely success. It cites the Unigine, and then it cites to and credits this testimony. And the only thing that this testimony shows is that you would have had a reasonable expectation of success, but you wouldn't know for sure. You wouldn't have an approved drug product, and I think that that's where the standard is conflated, and I think it's conflated also in the opposing brief where- Didn't he, the district court, he, she, she, didn't she compare Dr. Kent's testimony? Clearly she didn't ignore it. She pointed to the exact sections that you would want us to look at in this regard, but then goes on to say, given all the prior art, which taught EDTA or other chelating agents, chelating agents, they were necessary to stabilize the form of elation, the court rejects the argument. I mean, that's the very next sentence after her discussion of Kent. The court rejects the argument. So the reason it seems to me that she's saying she rejects it is there is a large body of prior art that teaches the requirement of chelating agents for stability, and EDTA in particular. And so Mr. Kent may have come, may come along, but you know experts get paid to say a lot of things, and Mr. Kent may have come along and said, you know, it would have been reasonable not to include this, but all the prior art went the other way, all of it, and there's no prior art that went his way. So why isn't that, this was a bench trial, and this is a fact finding. Why isn't that exactly the sort of thing that, even if I were to agree with you, we leave to the district court? Because I think that to the extent she made a fact finding that no prior art considered taking out EDTA or not using EDTA, that's clearly erroneous, because the approval letter, we think she didn't fully consider it, she cites it there, but she doesn't give any explanation anywhere in her opinion why the approval letter doesn't provide a motivation or suggestion under KSR to take out EDTA. Well, I've read the approval letter, and we just went through parts of it, you know, and the approval letter just tells them to investigate removing it. That isn't a suggestion to take it out. It's a suggestion to do an investigation about whether it's necessary, whether it could be replaced with something different, whether it could be removed altogether, but that's, I'm sorry, but that is not adequate for me. So I don't know. I mean, I understand Dr. Kent testified very effectively exactly what you would need him to say in this circumstance, but it seems quite clear from this paragraph that she rejected that in light of the other evidence. Well, thank you. I think I'm almost out of my time. Oh, yeah. I will restore your rebuttal time. We've been asking you lots and lots of questions. Sorry. No, no, not a problem. Okay. So we'll hear from the closing counsel. I'm just going to ask you to tell me how to say your name. Mazerowski, Your Honor. Mazerowski. Very good. Ms. Mazerowski. And since we're going to restore her five minutes of rebuttal time, this is a complicated case. If you need to go over, don't worry about the red light. Thank you, Your Honor. May it please the court. Mylan's appeal does not ask the court to revisit claim construction or the district court's findings and conclusions on anticipation. Rather, it argues de novo and asks the court to reweigh the evidence on who first proposed testing a formulation with no or lower EDTA, was the mere idea to test or a commitment to test a disclosure of all the limitations of the claimed method, i.e., treating acetaminophen overdose with a stable aqueous acetylcysteine solution or formulation with a particular concentration and pH stable free of all chelating agents. I think, Your Honor, you asked a question about laying aside all those critical elements, and what's important to remember here is that the district court did find that those were critical elements, that none of the disclosures disclosed all of the limitations and that those free of all chelating agents were key limitations. Is there a dispute in this record whether your product is acetidote? Acetidote. Acetidote meets the claim limitations, putting aside the chelating agent element? The prior art acetidote was made with EDTA, and all of the claims of the 445 patent of the claimed method of use require a formulation that is free of all chelating agents. Let me try to be clear. Does the earlier version of acetidote meet all of the claim limitations of the patent I've issued here, except for the free of chelating agent claim requirement? Your Honor, yes, it does. So if the FDA had said, please take out EDTA from your existing product, we expect it to be a success, don't put any other chelating agent back in place, you'd be in a tough spot. Yes, that would be true, but what the FDA did not say was don't put in any other chelating agents, and there was an admission that the district court relied on in making a specific finding that the approval letter did not anticipate because it didn't disclose all of the claim limitations. I just want to focus on what seems to me the aspect of the claims that matters here, which is the free of chelating agent aspect, not all this other stuff in the claims, because that was in the prior art acetidote. The court found that all of the elements of the claim are a unitary hole in a formulation, and the court found that you need to look at the composition as a unitary hole, that you can't treat the, based on expert testimony that she credited, that you cannot treat each of the elements separately, that it makes a difference because all of the molecules interact. They're not like a bag of marbles that you can just kind of pick one out and expect the rest to stay the same. There was consistent expert testimony that the court credited that these two formulations are entirely different formulations, and given the state of the prior art. There was only the most indirect reference, which surprised me, in the papers that we were given to the answer to the question, did you guys get a new drug application, file a new drug application and get one approved for the updated acetidote? Yes. Okay. When? In 2011, in January 2011. Is there some reason that's not in the record? It's very odd to me. I believe there was evidence. It may not have made it into the joint appendix, but there was evidence that in January 2011 the new product was approved. Was that a whole new drug application or was there some short form because it's making one change in an old one? It was done in a supplemental NDA because Cumberland had submitted a final report with all the data from its testing, and that's how it was approved. Supplemental to the original one? Yes, and both are approved and on the market today. Would that have been possible if a new chelating agent had been added in place of EDTA? Can I ask that question without having a particular view about why the answer might matter? I actually don't know about the regulatory aspect of it, but it may have been, like our product, a completely different product and may have required a different regulatory process. What's important to know about the date of the approval of our new product is that but two months after that, Mylan internal formulation scientists, when considering what product they were going to submit to be approved in an ANDA, wrote, we've learned about this new product and we are concerned that, quote, to heavy metals at low levels. Possibly some testing or spiking studies should be done to, quote, define what needs to be in place to compensate for EDTA removal. And this is part of the evidence for why success can be found not to have been reasonably expected, even they didn't. Exactly. There was U.S. V. Adams-type skepticism that even after knowing that the light bulb would keep burning, they didn't believe it. And they said that again in June of 2011. That March of 2011 skepticism is at A14346-47. And the same thing was said barely three months later. Iron in the glass may seep in and cause an issue with EDTA removal in June 2011 at A14562. We submit, Your Honor, that that further supports the district court's three core findings on the state of the art, which were germane to each of the issues she decided the way she did. First and foremost, that acetylcysteine is a highly unstable molecule. It oxidizes and degrades, loses its potency and becomes impure, the types of impurities that are at the tables in the patent at A100. Prior Art Lew coined the phrase notorious instability and taught use of a chelating agent such as EDTA to stabilize it or to take it completely out of solution and lyophilize it. Likewise, stropilo refers to its high reactivity. And Mylan's expert, Dr. Kent, at trial explained that it was well-known that acetylcysteine's thiol group, which is important to its activity, also happens to be the group that is subject to oxidation. Quote, thiol groups are well-known to oxidize. The district court relied on all of this in finding that it was well-known in the art at A4 and A26 and 28 of her thorough opinion on this issue that stability was known to be a problem and because stability is part and parcel of safety and efficacy, as Mylan's expert explained, a drug of unknown stability would not even be a drug and no physician would administer it. Can I ask you a question that maybe doesn't matter because reasonable expectation of success is necessary here, but I want you to focus on the motivation to combine. If the FDA says, go and try this, is that always, sometimes, never enough for the motivation to go and try it? Which may not be legally sufficient because they may ask you to try things that you just have this complete guesswork as to whether it would succeed or not. But just on the motivation to combine, the FDA says, go and try. The context is what matters, the factual context, and the specific factual context here was not only that acetylcysteine was highly unstable, but that for years every single commercial manufacturer of this treatment for IV use added EDTA. So there was a settled expectation, the accepted wisdom as the court called it at A28, a general understanding in the scientific community that you would need. But what all of that says, it seems to me that goes to either of two things. One, it might, in fact, be ample to show no reasonable expectation of success and then case over. But on the motivation to combine, maybe that says, had the FDA not said so,  but when the FDA says, go and try this, can't you check off, or can't the other side, check off the box? Okay, there was a motivation to combine, I mean to modify, to modify after the FDA said, go and do it. That's a pretty strong motivation. Your Honor, I believe the case law talks about there being a motivation to combine where there are a small number of reasonably successful options, not a limitless number of things that you could do. The FDA told you to do one thing. The FDA told us to... That's a very small number. The FDA took our commitment to test EDTA. There was a lot of testimony in the record that there were myriad ways of testing whether or not EDTA had effects on stability. One could, for example, do the type of spiking studies that were done in HAMLO or that Mylan scientists proposed after the fact in 2011. Those spiking type studies were quick and dirty studies that would have yielded information like HAMLO that yes, in fact, EDTA preserves stability. You could have varied many different parameters. Mylan's expert agreed in trial, and this was the basis of the court's finding, no anticipation, that one of the parameters that you could have modified was adding another chelating agent. You could modify pH. You could modify concentration. Dr. Byrne testified that it was like asking to make Corp Zero. You would start from the ground up, and you would take any number of possibilities that a formulation scientist would consider so that the options were really quite limitless. Mr. Pavel himself testified that he considered lots of different options, but kind of in the way that necessity is the mother of invention, he didn't have his own laboratory, and he took a route that was elegant for the result and yielded a long study that some other formulation scientist might not have done that he designed that was scheduled to go out 3, 6, 12, 36 months. So I think the answer to your question, to answer your question, is that it really depends on... There really wasn't one. There really wasn't one. I mean, that question has to be answered in the context of the state of the art and the options available to the scientist at the time and the specific request. Here the court also found that there was no directive or instruction to Mr. Pavlov as to what to test, what parameters to test, how to test. The only instruction there was was to conduct a test, and the type of test that everyone, even myelin scientists, agreed that was most likely to be done was a small-scale bench test, testing like myelin scientists suggested, spiking and getting a result in a few weeks or a month. Could you address the derivation argument? Yes. So what the court found on derivation was that the letter which myelin argued at trial and I guess argues again on appeal, the December 10th letter that requested justification for EDTA's presence in the composition was really just that, just a request to provide information and not an instruction or direction to generate any test. The court found significant in looking at that document that a page later the FDA did ask for tests, so that that was really not a request when it said, please provide justification and a description of its properties. As a finding of fact, the court read the document and said, that's not a direction to conduct a test, and it couldn't meet all of the elements of the claim methods for several reasons. One, it was just a request for justification. Two, it didn't provide any definition or instruction on how to conduct a test, what test to conduct. It left much open to the imagination. Suppose that the FDA had said, investigate whether EDTA can be removed and not replaced with any chelating agents. Suppose that had been the instruction so that it was much clearer. We want you to investigate whether EDTA can be removed and not replaced with any other chelating agents. If that had been the FDA mandate, how would this case come out? Had the FDA said those words, that you cannot use any chelating agents? Because they said the first part. They just didn't say, and replace it with nothing. Again, in the context of the state of the art, knowing that metal catalysis was such a problem for this composition, for this molecule, a formulation scientist would have looked at other parameters, other measures that would have adjusted for finding something for stability. Since the expectation was you needed something for stability, given this particular concentration and pH, the analysis, again, would have been the same. There are multiple options. The FDA hasn't given you specific direction. I think the question being asked is, suppose the direction really was specific. You have a product. It's on the market. Go and test that product with one change. Take out the EDTA. Don't put anything else back as a substitute. Make that one change. And the FDA is the one who had thought about that, the hypothetical. Forget about obviousness. Does that provide a derivation? No, because the FDA could not have appreciated that that for these, remember these are method claims that needs to be stable for human administration. And given the understanding of the state of the art, that it would not have been stable, and a conception requires a conception, an embodiment of all of the elements. It's actually in the claim, is it not? Yes. And the stables and suitable for IV administration is in the claims. So it would not have been a full conception of all of the elements, since the expectation is without any chelating agents, it would have been unstable and therefore unsuitable for its intended purpose. But if the FDA had said exactly what we're talking about and said, we're pretty sure this will be stable. Had they said, we know, in fact, it will be stable. No, they don't know, because for conception they don't actually have to confirm it, do they? Had the state of the art been different, and there could have been an expectation that it would have been stable, the answer might be different. But under these facts and this record and this state of the art, that would not have been the expected expectation. Okay, thank you very much. Thank you for my additional time, Your Honor. Ms. Stafford, you may restore your five minutes of rebuttal time. Thank you very much. I appreciate that. So I'd like to start off with the approval letter. I think there's a misconception. It's not just an invitation to investigate. It's actually a commitment that was entered into after a 14-month negotiation between Cumberland and FDA in which Cumberland, and it does call out specifically the test that has to be done, they have to evaluate the potential benefit of EDTA on the stability of the drug product. It was uncontested at trial by Mr. Pavlov and Cumberland that when it talks about the drug product, it's referring to the prior acetidote drug product that is the subject of the NDA that was approved. And so it's saying you have to look at the drug product formulation and you have to compare the stability of that versus a concentration of lower EDTA and no EDTA. And the fact that that is exactly what the parties understood is borne out by the actual study that Mr. Pavlov did and it's also confirmed by the chemistry review where it says you are to look at the effect of EDTA on the stability in the formulation. Now, it can't be an invention for Mr. Pavlov who admitted that the stability study that he designed, that he paid BioNiche to implement and then he evaluated the studies, he said none of that is inventive. And this clearly, to the extent that you believe there's not an express motivation, although we believe there is, this clearly falls within KSR where there is a market need and a design need and a market pressure that is put forth by FDA saying you need to look at getting rid of and removing EDTA. And there's a limited number of options and the most obvious one to try is just to take out EDTA because FDA was aware and by this time the industry was aware that there wasn't an issue with metal ions in the prior art acetidote formulation. It had specifications. This metal ions issue is a hearing. It's not discussed in the assertive patents and, in fact, if you look at the specifications for the prior art acetidote product, adding EDTA added more metal ions to the prior art drug product than everything else combined. And so if you're concerned about metal ions and you're concerned about adding EDTA and FDA wants it removed, then the easiest way to do that, the most obvious way to do that, is to take out the EDTA, which includes metal ions. So it's not just a suggestion and they did actually tell them exactly what they did to do, what they needed to do. Now this suggestion that there was an admission by Plankton's experts that you could have changed other things and fallen within the commitment that's spelled out in the approval letter, I think that's incorrect. If you look at that, I believe they're referring to the testimony of Dr. Civilotti, which is at the appendix at A8328 and 8329. And all he says there is that you could change other things to achieve a stable aqueous acetylcysteine formulation that would be EDTA free. He's not being asked about what the approval letter commitment was. He's just saying there are lots of ways that you can make acetylcysteine EDTA free. And that's also supported by Waterman. Waterman actually lists at page A14428 a list of things that you can do to prevent oxidation for protein products like in acetylcysteine. And it talks about the first one is you can store it in the refrigerator conditions. You can optimize the formulation of pH, which is the second one. You can apply a nitrogen headspace. Then it says you can remove excipients that are suspected of introducing transition metals. All of those first three things clearly are speaking to the first two, are speaking to what was done in the prior art acetate formulation that was controlled for by somebody else that developed that drug. The removing or replacing excipients that are expected of introducing transition metals tells you that if you want to get rid of EDTA, the most effective and efficient way to do that is just to remove it, and that also removes your metals and your source of metals. Can I ask you the most trivial of possible questions just to confirm something? Sure. The district court said at A11 that BioNiche was Mylan's predecessor company. Yes, that is true. So the prior art acetate product that is being talked about here was actually developed by a company that Mylan owns. It was developed long before Cumberland became involved. And so, as I believe counsel admitted, the prior art acetate product included every single element. It included the method of use, all the components, all the properties of all of the claims of the assertive patents, with one exception. It omitted EDTA. And all it did, all that Mr. Pavlov, the alleged inventor, did in response to this commitment that FDA put down in the approval letter is he told BioNiche, he said, Go make your prior art acetate product exactly like you make it for us, but just don't add EDTA. And then conduct a stability study just like you conduct all the other stability studies that you've done in the last decade and that we have made subject to approval, and then send me the results. And then he testified that he didn't have an invention until he saw those results. Those are industry standards tests. It cannot be an invention. To take the suggestion and the direction and the commitment that FDA gives you to take out EDTA, to do nothing else, to not create anything, and then to read a stability study to test results three months in and say, Gee, I guess it wasn't needed. I have an invention. That is not an invention. Okay, thank you, Ms. Stafford. Thank you.